ESTATE OF HEDWIG ZIETZ, WILLY ZIETZ, ADMINISTRATOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58654. Filed May 31, 1960.

*Benjamin Busch, Esq.*, for the petitioner.
*Charles M. Greenspan, Esq.*, for the respondent.

354

**358**

**OPINION.**

HARRON, *Judge:* The issue is whether securities held by banks in New York City upon the death of Hedwig, having a value of $697,-504.29, were her own property, rather than part of the then-remaining assets of the estate of Hugo to which his surviving son, Willy, was entitled as a final heir under his will, so as to be includible in Hedwig's estate under the provisions of sections 811, 860, and 862

of the 1939 Code.[1] See also Regs. 105, secs. 81.13, 81.49, and 81.50.

Respondent's determination places upon the petitioner the burden of proving that none of the securities belonged to Hedwig by virtue of her having purchased all or some of them with funds which originally were hers or which accrued to her from the estate of her husband, as her own funds, after his death in 1927, 18 years before her death.

Prior to his death, Hugo created bank accounts in 23 banks in the joint names of himself and his wife. It is necessary for petitioner to prove that all of these bank accounts remained the property solely of Hugo and were part of his gross estate devised and bequeathed under his last will, rather than joint tenancy accounts with a right of survivorship, the full title to which vested in Hedwig, directly, upon her husband's death and did not become part of Hugo's estate. Assuming that the bank accounts remained the property of Hugo and went into his gross estate, petitioner also has the difficult burden of proving how the income and principal of Hugo's estate were applied and used during the years 1927–1945. All of the securities in the United States at the date of Hedwig's death were acquired after the death of Hugo. In all of these matters, petitioner's burden of proof is difficult.

If the petitioner proves that every item involved was derived directly from the corpus of Hugo's estate, of which Hedwig was without question at least the income beneficiary for life, it then must be established: That under Hugo's will and the German law which controls the interpretation of its provisions, Hedwig did not have the complete title to the property in Hugo's estate during her life but, rather, that she had an interest in Hugo's estate which corresponded generally to what is known under the local law of jurisdictions within the United States as a life estate with the power of invasion, and that Willy had what corresponds to a remainder interest, so that the assets involved passed immediately upon Hedwig's death to him under Hugo's will.

---

[1] SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

(a) DECEDENT'S INTEREST.—To the extent of the interest therein of the decedent at the time of his death;

SEC. 860. RATE OF TAX.

A tax * * * shall be imposed upon the transfer of the net estate of every decedent nonresident not a citizen of the United States dying after the date of the enactment of this title.

SEC. 862. PROPERTY WITHIN THE UNITED STATES.

For the purpose of this subchapter—

(a) STOCK IN DOMESTIC CORPORATION.—Stock in a domestic corporation owned and held by a nonresident not a citizen of the United States shall be deemed property within the United States; * * *

Hugo Zietz was a resident of Germany and his disposition of his property by his will, the character of his bequests in his will, the nature and extent of the respective interests of the beneficiaries of his will were subject to German law and by that law the nature of interests under his will are to be determined. *Blair* v. *Commissioner*, 300 U.S. 5.

All of the questions are questions of fact, including the questions of German law. Questions of foreign law are fact questions which are to be proved by the taxpayer. *Bernhard Altmann*, 20 T.C. 236, 248.

Despite the difficult tasks which petitioner's burden of proof involved, it has met its burden satisfactorily and has overcome the prima facie correctness of the respondent's determination. Substantial and competent evidence under the fact questions and under the questions of German law was presented by the petitioner.

The testimony of Hans Seiler, a lifelong employee of the Zietz family, is entitled to considerable weight. His lengthy deposition was taken in Amsterdam before an American consul. A large quantity of his accounting records of the receipts and disbursements in Hugo's estate was sent to New York and made available. It is true that, because some of the earlier records were left in Dresden, which is now part of Russian-occupied Germany, and, therefore, could not be recovered, Seiler relied upon his memory about some matters. We have carefully considered the testimony based upon his recollection, have compared it with other items of proof, and have concluded that in the context of the entire record such testimony is within Seiler's own knowledge. It is concluded that Seiler's testimony is credible and competent. His testimony is, to some extent, corroborated by his accounting records and by other documents.

Seiler's testimony establishes with reasonable certainty that none of the securities involved were acquired with Hedwig's own funds or assets. Therefore, all of the securities involved here were derived from the estate of Hugo and were part of the remaining assets of the estate at the time of Hedwig's death.

The burden of proof upon the taxpayer does not require absolute certainty, exact figures, and the precise tracing of every item of receipts and expenditures. See *Boston & M. R.R.* v. *Commissioner*, 206 F. 2d 617, 626; *Cohan* v. *Commissioner*, 39 F. 2d 540, 543; *Burnet* v. *Niagara Falls Brewing Co.*, 282 U.S. 648, 655; *Niles Bemont Pond Co.* v. *United States*, 281 U.S. 357; *A. & A. Tool & Supply Co.* v. *Commissioner*, 182 F. 2d 300; *Arthur H. Blum*, 11 T.C. 101, 110, affd. 183 F. 2d 281; *Hemphill Schools* v. *Commissioner*, 137 F. 2d 961.

Seiler's testimony relates, in addition, to the circumstances attending the decision of Hugo to create bank accounts in his and

Hedwig's names, and his intention with respect thereto. Petitioner's Exhibit 41 (letters from a bank) supports Seiler's testimony.

In the matter of the ownership of and interests in the bank accounts, petitioner's evidence includes the testimony of an expert witness, Professor Otto Kahn-Freund, about the general form and legal effect of contracts with banks which are entered into by those who establish accounts in joint names.

Petitioner introduced into the record a 1952 decision of the highest court in Germany (Exhibit 31) in which the court defined the contractual relationship with a bank and the limitations of a joint account contract. The decision supports petitioner's contention that Hedwig received no property interest in the bank accounts in the joint names.

Petitioner's proof establishes that the form of the bank accounts in the joint names of the spouses, under the applicable German law, provides only the joint power of withdrawal and management, which powers survive the death of either depositor only insofar as the bank is concerned. The contract is between the bank, on the one hand, and the codepositors, on the other. The printed form of the contract is not conclusive between the two individuals as to whether a present gift from one to the other was intended. The contract is an authorization to the bank to discharge its obligation while both depositors are living, and after the death of either, it is an authorization to pay the survivor and to refuse to pay those who claim to be the heirs of the predeceased. It is a protection to the bank, and no more, so that it will not be bothered with the claims of heirs. It is stated in a case decided by the highest court of Germany, referred to above (the citation of the case is not clear), that "the creation of a joint deposit as an 'Or-Deposit' does not give any elucidation as to the internal legal relationship between the depositors, and especially as to the question who the owner of the securities deposited in such a deposit is."

The above rule is the same as the general rule in local jurisdictions in the United States. See, i.e., *Murray* v. *Gadsden*, 197 F. 2d 194, 197–205, where it is said, *inter alia*, that "when a depositor creates a joint account for himself and another, without consideration, it is presumed to have been done for the convenience of the depositor; * * * the printed form was not conclusive between the two individuals as to whether a present gift had been intended; * * *"

Respondent's reliance upon the form of the joint account contracts with the banks is misplaced. Under German law, where a husband creates a joint account in his and his wife's names, there is no presumption that the wife is either an owner or a coowner with her husband of the deposits in the account.

The petitioner has established, in general, that Hugo did not intend to make gifts to Hedwig of any interest in the joint accounts, that he owned them, and that upon his death the accounts became part of his estate. Hedwig declared them so to be in the inventory of his estate, and she paid taxes on the value of the entire inventory. The bank accounts became part of the corpus of the estate and part of the *Vorerbschaft* (resembling a life estate) with respect to which Hedwig was the first, or provisional heir (*Vorerbin*).

Upon the entire record, we find and conclude that the securities in the United States which are in dispute were not purchased with funds belonging to Hedwig, personally, and that the securities emanated from the corpus of Hugo's estate. In arriving at this conclusion, we have accepted as worthy of belief and as corroborated by certain records, Seiler's testimony that from 1927 to 1935, the general expenses of Hedwig and her sons exceeded the estate's current income; that in 1932, during the depression which existed in Europe as well as in the United States, Hedwig made sales of securities of American and Swiss corporations at a loss in excess of $400,000; and that during the years 1927–1936, under Hedwig's instructions, Seiler paid Hugo, Jr., and Willy approximately $1,400,-000. From those facts, it is clear that the securities could not have been purchased with Hedwig's own funds because she did not have sufficient funds of her own.

We turn now to the question of Hedwig's interest in Hugo's estate under his will, as construed under German law. Both parties rely upon the opinions of expert witnesses who are learned in German law. They qualified as experts competent to express opinions about the relevant German law. However, some opinions of the expert witnesses are in conflict. In view of the limited amount and extent of available commentaries on German law, and because, as is agreed, in our general law there are not the exact equivalents of the property interests defined in the German Civil Code, we think it is not surprising that there were some conflicts in the opinions of the experts called by the parties. Upon careful consideration of the lengthy record, we are persuaded by the testimony of petitioner's expert witnesses and are convinced that their explanations of German law are correct.

The testimony of petitioner's chief expert, Martin Domke, is to the effect that Hedwig's interest in Hugo's estate (*befreiter Vorerbin*) was that of a liberated first heir with the power to invade and consume corpus and to use and manage the estate assets, but she was restricted under German law by a prohibition against disposing of it by gift, devise, bequest, or any other means which would defeat the rights of the final heirs (*Nacherben*) to receive upon Hedwig's

death the remainder of the estate. Domke's opinion is supported by the ruling of the tax officials of Zurich. That ruling is entitled to a considerable degree of weight because it must be assumed that the Zurich tax department had a duty to make a correct determination of the total amount of Hedwig's estate. The proceeding before the Zurich tax officials was an adversary proceeding. Cf., *Eva V. Townsend*, 5 T.C. 1380, 1387.

We conclude upon all of the evidence relating to this question, that Hedwig was under a duty, under her husband's will and under German law, to preserve the estate assets for Hugo's final heirs; that she could not dispose of them in disregard of their remainder interests; that she did not receive a fee simple title to Hugo's estate upon his death; and that upon Hedwig's death, the remaining assets of Hugo's estate passed under his will to Willy Zietz who took them in substantially the same way as does a remainderman under our general law.

In the case, *In re Hirschmann's Estate*, 124 N.Y. Supp. 2d 801, 803–804, a similar issue was before Surrogate Frankenthaler in the New York County Surrogate's Court. He considered the same provisions of the German Civil Code, sections 2100 through 2137, and he concluded that a "first heir" has the characteristics of what in our law is known as a life estate. His conclusion was:

It appears that under German law the rights and duties of the surviving spouse as owner of the life estate as against the owners of the more remote interests conform closely to the rights and duties of holders of successive legal life estates under our law. 2. Restatement of the Law of Property, section 204. Accordingly, *the court holds that the* reciprocal *testament creates legal relationships* between decedent's widow and his two sons substantially *similar to the relationship known under our law as that of a legal life estate, with power to invade in the widow, and remainder interests in the two sons.* [Emphasis supplied.]

The fact that the custodian accounts in which securities were held and the securities were in the name of Hedwig is not indicative that Hedwig owned the absolute title to Hugo's estate. The petitioner has established that since a "liberated" first heir has the authority to manage the testator's estate, he (or she) is permitted to hold the estate property in his (or her) own name, but such permitted procedure does not mean that the property interest of the first heir amounts to the full ownership of the estate property.

Respondent's contentions about the provisions of Hugo's will and his understanding of the applicable German law are based upon a most literal translation of the terms *"Vorerbe"* and *"Nacherbe."* He then advances the argument that for the purposes of our Federal estate tax law, it must be held that under Hugo's will, Hedwig received a fee simple title to the whole estate of Hugo and that

consequently the death of Hedwig was the event which brought about the transfer of all that remained of or was derived from Hugo's estate, and that such property was inherited from her. Respondent's contentions present difficult questions. In general, under our own law, it is frequently a troublesome matter to reconcile seemingly conflicting decisions dealing with the question whether a devise created a life estate or a fee simple estate. Each case ordinarily involves the construction of a particular will in which the intention of the testator controls. Although in this case the ultimate question must be decided under Federal estate tax law, it is made complex by the necessity of ascertaining the true meaning of particular terms used in the German Civil Code which also were used in Hugo's will, and of understanding certain provisions of the German Civil Code. Nevertheless, we are satisfied that the petitioner has succeeded in proving what the applicable German law is.

In the Manual of German Law (His Majesty's Stationery Office, 1950), Vol. 1, p. 182, in the commentary on the Law of Succession by E. J. Cohn, the author points out that several principles of German law are unknown to English law. Among such principles is *"Universalsukzession"* which—

means that on the death of a person, his or her entire property passes immediately and automatically to his or her heirs. * * * It follows that there is in German law no interval between the death of the deceased and the succession to the title by his successors. * * * It follows that there is no room for the institution of trustees, executors and administrators of an estate in the sense of English law. * * * Those persons to whom the title to the estate or part of it immediately and automatically passes over on the death of the testator are called *"Erben"* (heirs).

German law does not recognize the concept of a trust. Consequently it is not possible for a testator to settle his estate upon trustees to hold it for the benefit of individual members of his family. * * * The German Civil Code has, however, permitted a testator to appoint heirs successively in such way that the first heir, who succeeds on the death of the testator, is heir during the period from the death until the occurrence of a defined event (usually the death of the first heir), while after this event another person or persons become heir in place of the first heir. The first heir is technically referred to as "provisional heir" *(Vorerbe)*, while the second heir is referred to as "reversionary" or "final heir" *(Nacherbe)*. * * *

Petitioner introduced into evidence other commentaries on the nature of the respective interests of a provisional heir and a final heir in German law, as well as decisions of German courts. These authorities support petitioner's contentions, and they lead us to agree with the conclusions stated in *In re Hirschmann's Estate, supra*.

The cardinal principle in the construction of wills is that the intention of the testator as determined from the entire will must prevail. It is our view that from the entire will of Hugo his inten-

tion is clearly evident, and that it was to provide an inheritance to his sons succeeding their mother's life estate. It is said that under the law of many jurisdictions, the great weight of authority supports the rule that a life estate expressly created by the language of an instrument will not be converted to a fee, or into any other form of estate greater than a life estate, merely by reason of there being coupled with it a power of consumption or invasion. 33 Am. Jur. 497, sec. 34. Cf. *Security-First National Bank* v. *United States*, 181 F. Supp. 911 (S.D. Cal., 1960); *In re Davies' Estate*, 242 N.Y. 196; *Powell's Estate*, 340 Pa. 404; *Roberts* v. *Morley*, 100 Fla. 267; *Terry* v. *Wiggins*, 47 N.Y. 512; *Estate of Michael Melamid*, 22 T.C. 966; *Estate of Edward F. Pipe*, 23 T.C. 99, affd. 241 F. 2d 210; *In re Potter's Estate*, 231 N.Y.S. 355; *In re Brower's Estate*, 104 N.Y.S. 2d 658; *United States* v. *De Bonchamps*, 278 F. 2d 127.

It is concluded that the securities held by banks in New York, involved here, were derived from and remained part of the corpus of Hugo's estate; that they were not Hedwig's own property; and that they are not includible in her estate.

*Decision will be entered for the petitioner.*